No. 95-2060

Koch Engineering Company,          *
Inc.;                              *
                                   *
        Plaintiff-Appellant;       *
                                   *
        v.                         *
                                   *
Gibralter Casualty Company,        *   Appeal from the United States
Inc.; International Insurance       *   District Court for the
Company;                           *   Eastern District of Missouri.
                                   *
        Defendants-Appellees;      *
                                   *
Aetna Casualty and Surety  *
Company;                           *
                                   *
        Defendant.        *

Submitted:  December 11, 1995

Filed:  March 11, 1996

Before FAGG, HEANEY, and WOLLMAN, Circuit Judges.

HEANEY, Circuit Judge.

     Appellant, the Koch Engineering Company, sued Gibralter Casualty
Company and International Insurance Company, pursuant to its umbrella
insurance policies, to recover a $7,059,476.60 judgment against Koch.
After a short bench trial, the United States District Court for the Eastern
District of Missouri found for the defendants and denied coverage.  Koch
appeals that decision.  We affirm.

BACKGROUND

In 1982, the Koch Engineering Company (Koch) contracted to design and supply the Monsanto Corporation (Monsanto) with new equipment for an existing ethylbenzene/styrene distillation tower. The tower, which is located at the Monsanto Refinery in Texas City, Texas, is over 220 feet high and 28.5 feet in diameter. The principal component of the new equipment was a packing material (Flexipac) that increased surface area, thereby facilitating the distillation function. The tower design consisted of six layers of Flexipac with liquid distributors between each layer. The distribution system initially employed by Koch was a tubular system consisting of pipes with small holes (between 0.1065 and 0.136 inches) that permitted liquid to pass through to the next layer of Flexipac. An alternative distribution system, rejected by the Koch engineers, would have employed troughs in lieu of pipes with holes. Although the trough distribution system is less likely to plug with debris, Koch chose the more efficient tubular system because it had determined that the distillation process was a "clean service," i.e., free from debris which might plug the distributor.

The equipment was installed in July 1983 by a construction company hired by Monsanto. Although it did not install the new equipment, Koch was contractually required to provide technical advice and oversee the installation. Tower operation commenced on August 2, 1983. Once in operation, the facility failed to produce the quantities of filtered liquid that had been guaranteed by Koch. After opening the tower on August 7, 1983, it was discovered that the pipe distribution holes were plugged with mill scale. Mill scale, a product of corrosion analogous to rust, only forms on carbon steel, which is the primary component of the Flexipac, at temperatures exceeding 1,100 degrees Fahrenheit; thus, there is little doubt that the mill scale formed during the carbon steel's manufacture. Although there is some dispute as to whether Koch should have noticed the mill scale, it is undisputed that Koch took

2

no action to guard against the presence of mill scale. Ultimately, despite an attempt to alleviate the plugging by cleaning the system, the tubular distribution system was replaced with a trough distribution system.

Monsanto sued Koch for breach of warranty. The case was tried to a jury in a federal court in the Eastern District of Missouri. The jury returned a verdict for Monsanto, awarding $7,059,476.60 in damages. The district court granted both parties' motions for a new trial on damages, but the parties ultimately settled on the same amount provided in the verdict. In 1989, Koch brought suit against its principal insurer, Aetna, and its excess insurers, Gibralter Casualty Company and International Insurance Company (Insurers), to recover the award. Aetna, whose coverage of Koch projects was limited to $1 million annually, paid Koch the limit in connection with a prior claim arising from a separate project and was dropped from the suit. After a bench trial in the Eastern District of Missouri, the district court found for the Insurers.

DISCUSSION

The district court, applying Missouri law, held for the Insurers on two distinct bases: i) the plugging of the tubular distribution system was directly attributable to Koch's reckless design, and was therefore not a fortuitous occurrence triggering the policies' coverage; and ii) the damage incurred as a result of the distribution system obstruction fell within the policies' coverage exclusion provisions. We review each finding in turn.

I.   Occurrence:  Was the Insurance Coverage Triggered?

The insurance policies in dispute provided coverage upon an "occurrence" resulting in personal injury or property damage. The policies define occurrence as "an accident, a happening, an event, or a continuous or repeated exposure to conditions which

results . . . in Property Damage neither expected nor intended from the standpoint of the Insured . . . ."  Missouri case law further provides that an occurrence is "that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual or unforeseen." Terrazzo v. Iowa Nat'l Mutual Ins., 566 F. Supp. 546, 552 (E.D. Mo. 1983). Thus, the first issue of coverage is whether the plugging of the distribution system constitutes an occurrence as defined by the policies.

The district court found that Koch had been reckless with respect to its design and supervision of the filtration system.  As a consequence, the court inferred that the plugging was not unexpected.  The characterization of Koch's conduct as reckless is a question for the trier of fact.  First Nat'l Bank of Fort Smith v. Kansas City S. Ry. Co., 865 S.W.2d 719, 729 (Mo. Ct. App. 1993).  As such, we review this determination under a clearly erroneous standard, taking all of the evidence in the light most favorable to the appellees.  Fed.R.Civ.P. 52(a).  Given the evidence that i) the Monsanto project was the largest filtration system ever attempted using this technology, ii) the Flexipac's licensor's warnings that tubular distribution systems tend to foul with debris, iii) prior difficulties with tubular distribution systems, and iv) the presence of the mill scale after its manufacture, the finding that Koch acted recklessly is not clearly erroneous.

The ramifications of this finding under Missouri law, however, are a matter of law.  We review the district court's determination of state law de novo.  Salve Regina College v. Russell, 499 U.S. 225, 231 (1991). Although Missouri case law clearly holds that accidents resulting from the insured's negligent behavior fall within the definition of occurrence, Terrazzo, 566 F. Supp at 546, it is less clear with respect to actions characterized as reckless.

In 1987, the Missouri Court of Appeals explicitly held that reckless conduct, by definition, means that the actor "realized or

4

should have realized there was a strong probability his conduct would cause the injury." Farm Bureau Town & Country Ins. Co. v. Turnbo, 740 S.W.2d 232, 234 (Mo. Ct. App. 1987). From this starting point, the court reasoned that this expectation excluded the reckless act from the definition of occurrence and thus, the resulting injury was deemed not covered. Id. at 236. In 1991, however, the Missouri Supreme Court, without mentioning Turnbo by name, rejected "the suggestion that a showing that the insured acted recklessly compels a finding that injury was expected." American Family Mut. Ins. Co. v. Pacchetti, 808 S.W.2d 369, 371 (Mo. 1991). "Although recklessness is sometimes the legal equivalent of intention, . . . . [i]t remains for the insurer to show that this particular insured expected or intended the result which occurred." Id.

Although the district court explicitly inferred intent from Koch's conduct, this court has the power to correct mixed questions of law and fact where the finding is predicated on a misunderstanding of the governing state law. Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 501 (1984). The Missouri Supreme Court has held that regardless of the reckless character of behavior, the insurer must show that Koch intended the results of its actions. Pachetti, 808 S.W.2d at 371. The project underlying this suit was a highly technical, complex enterprise. The fact that venture was of an unusually large scale exacerbated the number of variables being considered. While we do not hold the district court's finding of recklessness clearly erroneous, there is simply no evidence in the record that Koch intended for the holes to become plugged with debris. As such, the district court's finding of recklessness alone does not support the inference of intent. Thus, the controlling expression of the applicable state law, Pacchetti, requires this court to hold for the insured on this point: the plugging of the distribution system constituted an occurrence and triggered the policies' coverage.

II.  Exclusion:  Was the Coverage Excluded?

Although we hold that the plugging of the distribution system constituted an occurrence, triggering policy coverage, the policies contain a number of provisions that carve out areas of non-coverage.  The district court held that these exclusions were applicable.  The interpretation of the contractual provisions of an insurance policy is a matter of law reviewed by this court de novo.  Delmar Bank v. Fidelity & Deposit Co. of Maryland, 428 F.2d 32, 35 (8th Cir. 1970).

Insurers rely on two separate exclusion provisions as the basis for denying coverage.  The first exclusion, Section VI.B.2, provides as follows:

> [The policy does not apply to property damage] to the Insured's products arising out of such products or any part of such products, but this exclusion shall apply only to the particular individual product or part thereof, out of which the occurrence arises and not to the other products or part thereof which may be damaged thereby . . . .

This provision is followed by a mirror carve out, Section VI.B.3, that pertains to property damage arising out of work performed by the insured:

> [This policy shall not apply to property damage] to work performed by or on behalf of the Insured arising out of the work or any portion thereof, or out of materials, parts, or equipment furnished in connection therewith, but this exception shall apply only to that portion or component of the work out of which the occurrence arises and not to the work as a whole or to other work of the Insured which may be damaged thereby.

Koch concedes that but for the exclusion's exception, Section VI.B.2 would exclude coverage.  Appellant's Br. at 24.  Koch asserts, however, that the exclusion's exception applies because "[t]he unexpected presence and release of mill scale from the

packaging damaged another part of Koch's product, by plugging the tubular distributors." Appellant's Br. at 25. This characterization of where the damage occurred is contradicted by the appellant's own later assertion that "focus must be placed on the language of the policy, and when this is done, it is clear that an insurable event occurred when the mill scale was released from the packaging and plugged the distributors." Reply Br. at 3-4 (emphasis added). Neither party alleges that any damage occurred upon the formation of the mill scale: Had the mill scale flushed through the distribution system without obstructing the holes, there would not have been any damage. The damage occurred when the mill scale plugged the small holes of the tubular distribution system. Thus, the "occurrence" took place within the distribution system. The exception to the exclusion provides coverage for parts other than that in which the occurrence took place, and given that the occurrence took place within the distribution system, the damage related to the replacement of the distribution system is excluded by these provisions.

The damages assessed by the jury in the original trial were $7,059,476.60. Of this amount, approximately $5,317,903.00 constituted the award for the clean up and distribution system replacement. The other $1,741,573.60 represented lost profits. The entire damage claim assessed against Koch arises from the clogging of the distribution system. As such, the whole amount fits within the exclusions.

III. The Aetna Policy: The "No Less Broad" Provision.

Finally, Koch argues that despite any exclusion provisions contained in the policies, the excess policies provided that their coverage, notwithstanding their own contractual terms, would be "no less broad" than the principal Aetna policy.

7

The Aetna policy also contained exclusion provisions, one of which provided:

> [This policy does not apply to property damage:] (2) with respect to the completed operations hazard, work performed by the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith . . . .

The policy defines "completed operations hazard" as follows:

> [C]ompleted operations hazard includes-- property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the . . . property damage occurs after operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.

The district court held that this Aetna exclusion, which contains similar, but not identical, language to the Insurers' policies, would similarly exclude coverage in this instance. Again, we review this interpretation of the policy de novo. Delmar Bank, 428 F.2d at 35. The main difference between the two provisions is the limitation of the exclusion in the Aetna provision to completed operations hazards. Given, however, that the plugging occurred in August 1983 and Koch personnel left the premises on July 29, 1983, the property damage occurred "after operations [had] been completed" and thus within the exclusion's limitation to completed operations hazards. Therefore, we concur with the district court's analysis on this issue.

For the above-stated reasons, we affirm.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

8